When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials. EEOC v. St. Francis Xavier Parochial Sch. , 117 F.3d 621, 624 (D.C. Cir. 1997). Relevant here, the Court may consider Moore's EEO documents. See Bowden v. United States , 106 F.3d 433, 437 (D.C. Cir. 1997) (considering "the pleadings and undisputed documents in the record" while reaching the merits on a *88 motion to dismiss); Vasser v. McDonald , 228 F.Supp.3d 1, 11 (D.D.C. 2016) (taking judicial notice of informal and formal administrative complaints on a motion to dismiss); Williams v. Chu , 641 F.Supp.2d 31, 35 (D.D.C. 2009) ("A plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice." (quotation marks and alteration omitted) ). Finally, a Rule 12(b)(6) dismissal "is a resolution on the merits and is ordinarily prejudicial." Okusami v. Psychiatric Inst. of Wash., Inc. , 959 F.2d 1062, 1066 (D.C. Cir. 1992).
III. ANALYSIS
A. Count I: Hostile Work Environment
1. Allegations Before November 26, 2013
The defendants argue that the 2013 settlement agreement bars Moore from asserting any allegations that predate November 26, 2013. See Defs.' Mot. to Dismiss 1, 3-4, 9-11. The Court agrees.
Courts have repeatedly held that a valid settlement agreement bars a plaintiff from asserting facts covered by the agreement in a subsequent hostile environment action. See Perry v. Gotbaum , 766 F.Supp.2d 151, 166 (D.D.C. 2011) ("[A]ny claims relating to conduct prior to [the date specified in the settlement agreement] have been settled and released by [the plaintiff], and the Court may not consider such conduct as a basis for [the plaintiff's] hostile work environment claim."); Johnson v. Ashcroft , No. 02-1745, 2005 WL 2064095, at *4 (D.D.C. Aug. 25, 2005) (pre-settlement allegations could not be considered in subsequent hostile environment suit even though the suit "involve[d] a different legal claim" because the "plain language" of the settlement agreement "release[d] the defendant from liability based on any claim or cause of action that could have been asserted during the mediation process"); Miller v. United States , 603 F.Supp. 1244, 1251 (D.D.C. 1985) (refusing to consider pre-settlement allegations even on a continuing violation theory because the settlement agreement "contain[e]d no such limitation"); see also Hopkins v. Bd. of Educ. of City of Chicago , 73 F.Supp.3d 974, 984 (N.D. Ill. 2014) ("By virtue of the settlement agreement, [the plaintiff] effectively agreed to carve out conduct predating [her EEOC complaint] from any future claim she might assert.").
The settlement agreement here bars Moore from asserting any claims against the Department or its officials "whether or not known arising, or which might arise, up to and including the date of [the] Agreement." Defs.' Mot. to Dismiss Ex. 1, ¶ 1. That language clearly forecloses a hostile work environment claim premised on events before November 26, 2013, when the agreement was executed, see id. ¶ 11.
Moore resists this conclusion because, in his view, the settlement agreement is invalid. See Pl.'s Opp'n at 14-16. There is no question that he entered the agreement, see Compl. ¶ 28, and subsequently sought to enforce it against the Department, see id. ¶¶ 30, 48. Nevertheless, Moore argues that the agreement is legally invalid because it lacked "substantial consideration" and because the Department "negotiated in bad faith." Pl.'s Opp'n at 15.
Moore cites no authority to support this legal conclusion, which is alleged nowhere in Moore's complaint and would enjoy no deference even if it were. See Iqbal , 556 U.S. at 678, 129 S.Ct. 1937. A settlement agreement "between one private party and a federal agency ...-like any contract with the federal government-is governed by federal common law." Wright v. Foreign Serv. Grievance Bd. , 503 F.Supp.2d 163, 173 (D.D.C. 2007), aff'd , *89 No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (per curiam). When fashioning the federal common law of Title VII settlement contracts, the D.C. Circuit looks to the Second Restatement of Contracts because its principles "represent the prevailing view among the states and are consistent with the remedial policies of Title VII." Bowden , 106 F.3d at 439 (internal quotation marks and citation omitted). Applying these principles, both of Moore's arguments for invalidity fail.
As for his first argument-that the agreement lacked "substantial consideration"-courts ordinarily "do not inquire into the adequacy of consideration," especially "when one or both of the values exchanged are uncertain or difficult to measure." Restatement (Second) of Contracts § 79 cmt. c. (1981).[8] Here, Moore agreed to withdraw all claims against the Department; in exchange, the Department agreed to take a number of specific actions to facilitate Moore's career advancement within the Department. See Defs.' Mot. to Dismiss Ex. 1 ¶¶ 1, 9. This exchange satisfies the requirement of a bargained-for benefit or detriment, and the Court will not inquire further into the relative value each party received.
Moore's second argument-that the Department negotiated in bad faith-is equally unavailing. The Second Restatement does not recognize bad faith as an independent basis for invalidity; rather, "[p]articular forms of bad faith in bargaining are the subjects of rules ... as to invalidating causes such as fraud and duress." Restatement (Second) of Contracts § 205 cmt. c. Moore invokes none of these specific invalidation rules. He argues only that the agreement is invalid because of three facts: (1) the Department brought five representatives to the mediation while Moore was unrepresented; (2) the Department refused to let Moore release the memorandum summarizing the Diplomatic Security investigation without a disclaimer that its contents reflected Moore's own views rather than the Department's; and (3) the Department failed to disclose that Kerry Howard had been issued a "right to sue letter" by the Office of Civil Rights. See Pl.'s Opp'n at 15-16 (citing Compl. ¶¶ 28, 30, 54).
These facts do not establish invalidity under any of the potentially applicable invalidation doctrines-namely, unconscionability, duress, or misrepresentation. "A party attacking the validity of a settlement agreement bears a properly heavy burden." Kent v. Dep't of the Air Force , 524 F. App'x 614, 616 (Fed. Cir. 2013) (internal quotation marks omitted and alteration adopted). To establish unconscionability, Moore would have to allege "elements of deception or compulsion" or that he "had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms." Restatement (Second) of Contracts § 208 cmt. d. To establish duress, he would have to allege that the Department committed "coercive acts." Kent , 524 F. App'x at 616. And to establish misrepresentation through non-disclosure, he would have to allege that the Department knew or "ha[d] reason to know" that the undisclosed fact *90 would "influence [Moore] in determining his course of action." Restatement (Second) of Contracts § 161 cmt. b.
Moore's trio of "bad faith" allegations falls short of these standards. First, although Moore was unrepresented during mediation, he does not allege that he was in any way prevented from retaining counsel. In fact, he expressly "agree[d] and acknowledge[d]" that he had "been afforded the opportunity to consult with legal counsel" before signing the settlement agreement. Defs.' Mot. to Dismiss Ex. 1, ¶ 4. Further, the presence of multiple Department officials during the mediation did not plausibly amount to coercion or otherwise render the resulting agreement involuntary. Indeed, Moore admits that the officials' presence, while intimidating, assured him that his complaints were being "taken seriously." Compl. ¶ 28.
Second, although Moore may have been disappointed that he could not use the memorandum summarizing the Diplomatic Security investigation to publicly clear his name, an agreement is not unenforceable "merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party." Restatement (Second) of Contracts § 208 cmt. d. The agreement bound the Department to issue the memorandum to Moore -not to the public. See Defs.' Mot. to Dismiss Ex. 1, ¶ 9. By failing to bargain for a commitment by the Department to publicly exonerate him or to allow him to speak freely with the media, Moore assumed the risk that the memorandum would not clear his name as he hoped. To the extent Moore disagrees and believes the Department breached its obligations under the agreement, the agreement itself provides a remedy: Moore can allege non-compliance before the Office of Civil Rights and, if he prevails, return to the status quo and reinstate his 2013 EEO claim. See id. ¶ 1. Moore started that process, lost, and abandoned his complaint by choosing not to appeal or request reconsideration of the Office's decision. See Defs.' Mot. to Dismiss Ex. 2, at 5-6. He cannot resurrect that complaint now by repackaging it as a "bad faith" defense to the agreement's validity.
Finally, although the Department did not disclose that Kerry Howard had received a right-to-sue letter from EEOC, that letter was the natural consequence of Title VII's enforcement procedures and simply reflected the fact that EEOC had completed its investigation. See 42 U.S.C. § 2000e-5(f)(1) ; see also 29 C.F.R. § 1601.19(a). An ordinary person would regard the issuance of a right-to-sue letter-which itself has no bearing on the merits of the underlying employment discrimination claim-as unimportant, and the Department had no reason to expect Moore to think otherwise. See Restatement (Second) of Contracts § 161 cmt. b (a party "need not disclose facts that the ordinary person would regard as unimportant unless he knows of some peculiarity of the other person that is likely to lead him to attach importance to them"). Moore does not allege that the Department knew or believed that Kerry Howard would file a federal lawsuit or that any such suit would be meritorious. See Compl. ¶ 28. Nor does he allege that the Department expected or planned to settle Kerry Howard's claim. See id. Rather, Moore faults the Department for failing to "suggest[ ]" that a potential lawsuit could create a potential opportunity for the Department to defend him publicly. Id. The Department's failure to consider and share this speculative possibility, however, cannot plausibly be considered an element of deception or the omission of a material fact.
*91 In short, Moore has not established any legal basis for invalidating the settlement agreement. The Court will therefore "carve out" any allegations before November 26, 2013 from Moore's hostile environment claim and consider them "only as background information and only to the extent necessary to understand [his] claims." Hopkins , 73 F.Supp.3d at 984.
2. Merits
A hostile work environment exists where a plaintiff's employer subjects him to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Baloch v. Kempthorne , 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris v. Forklift Sys., Inc. , 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ). In assessing whether a hostile work environment exists, courts "look[ ] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id.
Stripped of the pre-settlement allegations, Moore's hostile work environment claim consists of:
• Moore's failure to receive any promotions or performance-based bonuses from November 26, 2013 through 2016. Compl. ¶ 43.
• Young's 2015 Office of Inspector General complaint accusing Moore of perjury. Id. ¶ 39.
• Kerry Howard's federal lawsuit and the Department's decision to settle it. Id. ¶ 35.
• The Department's refusal to allow Moore to release the memorandum summarizing the Diplomatic Security investigation without stating that it expressed Moore's personal views and not the official views of the Department. Id. ¶ 37.
• The Department's failure to revise Moore's 2012 employee evaluation. Id. ¶ 30.
• The Department's decision to abandon the tentative settlement agreement it had reached with Moore during mediation in 2016. Id. ¶ 48.
• A Department employee's suggestion that Moore consult with HR because "there were 'black people' there." Id. ¶ 36.
• Robinson's suggestion that Moore seek employment in the private sector. Id. ¶ 38.
These allegations do not establish "severe or pervasive" harassment. First, the allegations are relatively infrequent and spread out over at least two years and across multiple offices within the Department. See Nurriddin v. Bolden , 674 F.Supp.2d 64, 94 (D.D.C. 2009) (dismissing hostile work environment claim in part because "the alleged events [we]re temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness").
Second, the allegations largely concern Moore's prospects for advancement, as opposed to verbal or physical abuse in his actual work environment. "[C]ourts have been hesitant to find a claim for hostile work environment when a complaint contains no allegations of discriminatory or retaliatory intimidation, ridicule, or insult in the plaintiff's day-to-day work environment and relies instead on incidents of allegedly discriminatory non-promotions and other performance-based actions." Outlaw v. Johnson , 49 F.Supp.3d 88, 91 (D.D.C. 2014) (internal quotation marks omitted and alteration adopted). But see *92 Behrens v. Tillerson , 264 F.Supp.3d 273, 280 (D.D.C. 2017) (allowing hostile work environment claim to proceed based largely on performance-related personnel decisions). For example, in Laughlin v. Holder , the plaintiff alleged that a "reassignment" had "hurt her reputation and undermined her leadership," 923 F.Supp.2d 204, 220 (D.D.C. 2013), and that she had remained in the same role "for more than seven years while nearly all of [her] peers [we]re promoted," id. at 221. But despite the plaintiff's claim that this career stagnation was "objectively and subjectively humiliating," the court "simply d[id] not find that the non-promotions and other performance-based actions alleged r[ose] to the level of an actionable hostile work environment." Id. Similarly, in Nurriddin v. Bolden , the court dismissed a hostile environment claim where the employer allegedly
passed [the plaintiff] over for performance awards, lowered his performance evaluations, unfairly reprimanded and criticized him, made disparaging remarks about his EEO complaints, closely scrutinized his work, refused him a window cubicle, removed some of his duties, ... denied his requests to travel or otherwise failed to provide support for his work with staffing and funding[, and] opposed his career advancement in more direct ways, including the denial of a noncompetitive promotion, denial of a within-grade increase, and opposition to his transfer to another office or detail assignment.
674 F.Supp.2d at 93-94. The Court reasoned that the disparaging remarks, diminished responsibility, negative evaluations, and close scrutiny were not "sufficiently intimidating or offensive in an ordinary workplace," and it rejected the plaintiff's attempt to combine those events with "nonpromotions, denial of leave, and termination" to establish a hostile work environment claim. Id. at 94. So too here, Moore's various performance- and promotion-related allegations were not intimidating or offensive enough to be considered harassment.
Third, the allegations by Young and Kerry Howard were made outside the workplace in administrative proceedings and public court filings and do not demonstrate harassment within Moore's actual work environment. At most, Moore accuses the Department of engaging in passive harassment, by failing to take affirmative steps to rebut those employees' allegations. But assuming silence can ever constitute actionable harassment-a doubtful proposition-the Department's decision not to comment on the Naples allegations was squarely addressed by the 2013 settlement agreement and cannot form the basis for a subsequent hostile work environment claim. See Miller , 603 F.Supp. at 1251. Further, the Department was limited in its ability to prevent or interfere with its employees' administrative and federal court proceedings, which are themselves protected by Title VII. See 42 U.S.C. § 2000e-3(a) ; Rochon v. Gonzales , 438 F.3d 1211, 1215-16 (D.C. Cir. 2006) (explaining that Title VII's substantive retaliation provisions apply to suits against the federal government); cf. Perry , 766 F.Supp.2d at 168-69 (employer entitled to summary judgment where hostile work environment claim was premised on its "failure to stop [statutorily protected] conduct").
Although Moore does allege a single offensive and racial remark by a high-level Department employee, see Compl. ¶ 36, generally the "mere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII," Harris , 510 U.S. at 21, 114 S.Ct. 367 (internal quotation marks omitted and alteration adopted). The D.C.
*93 Circuit has suggested that the use of a single "deeply offensive" and "unambiguously racial" epithet might be "sufficient to establish a hostile work environment," Ayissi-Etoh v. Fannie Mae , 712 F.3d 572, 577 (D.C. Cir. 2013) (per curiam) (internal quotation marks omitted), but the isolated comment here-while racially charged and insulting to Moore-was not so deeply and unambiguously offensive as to create a hostile work environment, even in combination with Moore's various other allegations.
Wise v. Ferrero , on which Moore relies, is consistent with this conclusion. 842 F.Supp.2d 120 (D.D.C. 2012). There, a supervisor used the one uniquely offensive racial epithet that the D.C. Circuit has suggested can create a hostile environment by itself. See id. at 121 ; Ayissi-Etoh , 712 F.3d at 577. In addition, the plaintiff received "threats of discipline," was "singled out and excluded from trainings and award ceremonies," and was "denied promotions." Wise , 842 F.Supp.2d at 126. The court held that these allegations "cleare[ed] the Motion-to-Dismiss hurdle, if not by much." Id. at 127. But if Wise presented a borderline case, then Moore's allegations clearly fall short, as they lack the key elements of insult, ridicule, and exclusion that pushed Wise over the edge. See id. at 126-27.
Upon reviewing the totality of the Department's alleged discriminatory conduct and its frequency, severity, offensiveness, and impact on Moore's work performance, the Court concludes that Moore has not alleged a hostile work environment. Moore's various disappointments and conflicts within the Department do not establish that he was subjected to "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive" to "create an abusive working environment." Baloch , 550 F.3d at 1201 (internal quotation marks omitted). The Court will therefore dismiss count I.[9]
B. Count II: Retaliation
There is some confusion over whether count II raises a claim of retaliation based on discrete acts or a retaliatory hostile work environment. Compare Defs.' Mot. to Dismiss at 7-8 (treating count II as a discrete retaliation claim), with Pl.'s Opp'n at 23-25 (treating count II as a retaliatory hostile work environment claim). Although Moore insists in his opposition brief that the "Department's retaliatory actions ... are building blocks of a hostile work environment, not discrete acts," Pl.'s Opp'n at 23, and that his "allegations are not discrete acts of discrimination," id. at 24, that theory strays significantly from his complaint. The only mention of a hostile work environment in his complaint appears in count I, both in the heading, Compl. at 17, and in a paragraph alleging a hostile work environment due to "racial discrimination," id. ¶ 52. Although count II "adopts and incorporates by reference" every other allegation in the complaint, id. ¶ 60, it does not mention a hostile work environment in the heading; nor does it allege that such an environment was imposed on account of *94 Moore's participation in protected activity, see id. at 19-20.
Ultimately, the difference is immaterial. If count II does advance a retaliatory hostile work environment claim, then it fails to allege severe or pervasive harassment for the reasons described above. See supra III.A. If, on the other hand, it advances a discrete retaliation claim, then it fails to allege an adverse employment action within the relevant filing period, for the reasons that follow.
"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." Payne v. Salazar , 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotation marks omitted and alterations adopted); see also 42 U.S.C. § 2000e-16(c). The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision," Park v. Howard Univ. , 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted and alteration adopted), and it "ensure[s] that the federal courts are burdened only when reasonably necessary," Brown v. Marsh , 777 F.2d 8, 14 (D.C. Cir. 1985). In the Title VII context, failure to exhaust is an affirmative defense, and thus "the defendant bears the burden of pleading and proving it." Bowden , 106 F.3d at 437 ; see also Smith-Haynie v. District of Columbia , 155 F.3d 575, 578 (D.C. Cir. 1998) ("[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint.").
When the employee alleges that he or she was the victim of a "discrete retaliatory or discriminatory act," the timeliness inquiry focuses on that particular act. Nat'l R.R. Passenger Corp. v. Morgan , 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) ; see also Achagzai v. Broadcasting Board of Governors , 170 F.Supp.3d 164, 175 (D.D.C. 2016). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Morgan , 536 U.S. at 113, 122 S.Ct. 2061.
"Under Title VII, employees who believe they have been discriminated against must first consult an Equal Employment Opportunity (EEO) Counselor within 45 days of the alleged discriminatory acts." In re James , 444 F.3d 643, 644 (D.C. Cir. 2006) ; see 29 C.F.R. § 1614.105(a)(1). Moore first contacted the EEO Counselor on December 8, 2015. See Defs.' Mot. to Dismiss Ex. 5 at 7. Counting back forty-five days from that date, Moore timely consulted the EEO Counselor regarding only discriminatory or retaliatory acts that occurred on or after October 24, 2015.
That leaves Moore with two possible discrete acts of retaliation: the perjury accusation Young submitted to the Office of the Inspector General "[i]n late fall of 2015," Compl. ¶ 39, and the Department's decision in 2016 to abandon a tentative settlement agreement with Moore after he contacted the Office of Civil Rights about the Department's alleged bad faith, id. ¶ 65.[10]
*95 Neither allegation suffices. To a state a claim for retaliation under Title VII, a complaint must "plausibly establish" that "the employee suffered a materially adverse action by the employee's employer." Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington , 737 F.3d 767, 772 (D.C. Cir. 2013). Young's OIG complaint does not qualify because "the request for an investigation by an independent body (as opposed to the disciplinary action that may follow) does not constitute an actionable adverse employment action," and Moore does not allege any disciplinary or other employment action resulting from the investigation. Ware v. Billington , 344 F.Supp.2d 63, 76 (D.D.C. 2004) ; see also King v. Holder , 77 F.Supp.3d 146, 151 (D.D.C. 2015) (applying this principle to a retaliation claim premised on the initiation of an Office of Inspector General investigation).[11]
The Department's abandonment of the 2016 settlement agreement also does not qualify as a materially adverse action. Even if the tentative, unmemorialized agreement were binding, but see 29 C.F.R. § 1614.603 ("Any settlement reached" between an agency and a discrimination claimant "shall be in writing and signed by both parties...."), an employer's breach of a settlement agreement for discriminatory or retaliatory reasons "is not enforceable under Title VII as an adverse personnel action because it is appropriately addressed under principles of contract law," Kilpatrick v. Paige , 193 F.Supp.2d 145, 154 (D.D.C. 2002).
Because Moore alleges neither severe or pervasive harassment nor a discrete and materially adverse action within the 45-day filing window, the Court will dismiss count II.
C. Count III: Discrimination
Count III fails for the same reason as count II. The only discrete acts alleged in the relevant filing window are Young's perjury complaint and the Department's abandonment of the tentative settlement agreement in 2016-neither of which qualifies as an adverse employment action. See Baloch , 550 F.3d at 1196 (an "adverse employment action" is an "essential element[ ]" of a Title VII discrimination claim).
Count III also fails for an independent reason: Moore never exhausted a claim based on discrete acts of discrimination. Rather, his administrative complaint and supplement alleged only that he had "been the victim of continuing discrimination *96 ... in the form of a hostile work environment ." Pl.'s Opp'n Ex. 1 at 9 (emphasis added). Based on the hostile work environment theory advanced in Moore's administrative complaint, the Department notified Moore by letter that it had accepted a single claim of a retaliatory and discriminatory "hostile work environment" for investigation. Defs.' Mot. to Dismiss Ex. 4 at 1; see also id. at 1-2 (explaining that Moore would have an "opportunity to discuss specific examples of the hostile work environment" and that these examples would "be investigated within the penumbra of the hostile work environment allegation"). Moore was given an opportunity to object to the agency's framing and "propose an alternative formulation" if he "believe[d] the issues ha[d] not been properly articulated,"id. at 2, but he did not do so.
"A Title VII lawsuit following the EEOC charge is limited in scope to claims that are like or reasonably related to the allegations of the charge and growing out of such allegations." Park , 71 F.3d at 907 (internal quotation marks omitted). Because a hostile work environment claim and a discrete discrimination claim are "different in kind," Morgan , 536 U.S. at 115, 122 S.Ct. 2061, exhausting one does not exhaust the other. Moreover, "courts have generally held that failure to respond to the [agency's] framing of the issue supports a finding that a plaintiff has failed to exhaust his administrative remedies with respect to those claims not approved by the EEO." McKeithan v. Boarman , 803 F.Supp.2d 63, 68 (D.D.C. 2011) (internal quotation marks omitted) (collecting cases), aff'd in part , No. 11-5247, 2012 WL 1450565 (D.C. Cir. Apr. 12, 2012) (per curiam), aff'd sub nom. McKeithan v. Vance-Cooks , 498 F. App'x 47 (D.C. Cir. 2013) (per curiam). "[W]here an agency reasonably fails to identify for investigation a claim indirectly asserted in a plaintiff's administrative charge, and where the plaintiff does not timely object to this omission before the agency, the plaintiff cannot show that he has exhausted administrative remedies as to this claim." Dick v. Holder , 80 F.Supp.3d 103, 114-15 (D.D.C. 2015).
Here, the Department acted reasonably in omitting a discrete discrimination claim from its investigation. Moore's complaint focused exclusively on a hostile work environment theory, see Pl.'s Opp'n Ex. 2 at 9-10, and Moore "made no attempt to augment the accepted allegation or amend his [EEO] complaint prior to the conclusion of the investigation," Green v. Small, No. CIV.A. 05-1055, 2006 WL 148740, at *6 (D.D.C. Jan. 19, 2006) (internal quotation marks omitted). Because Moore did not exhaust a discrete discrimination claim, he cannot advance one for the first time here.[12]
The Court will dismiss count III for failure to state a claim on the merits and for failure to exhaust administrative remedies.
CONCLUSION
For the foregoing reasons, the Court grants the defendants' motion to dismiss. A separate order accompanies this memorandum opinion.

See also Restatement (First) of Contracts § 81 cmt. a. (1932) ("[W]hatever consideration a promisor assents to as the price of his promise is legally sufficient consideration."); 3 Williston on Contracts § 7:21 (4th ed.) ("[S]o long as the requirement of a bargained-for benefit or detriment is satisfied, the fact that the relative value or worth of the exchange is unequal is irrelevant so that anything which fulfills the requirement of consideration will support a promise, regardless of the comparative value of the consideration and of the thing promised. The rule is almost as old as the doctrine of consideration itself." (footnotes omitted) ).

Although the Court does not consider Moore's pre-settlement allegations, it would reach the same conclusion even if it did. The Naples employees' original accusations were made outside the workplace in administrative proceedings, to a U.S. senator, and in the media; the Department's role in the scandal was passive and impacted Moore's promotion and advancement as opposed to his actual workplace environment; Moore's detail to a "dead-end position" was a performance-related personnel decision; and the handful of offensive comments made by employees about Moore's reputation and the prostitution rumors were infrequent and scattered across different units within the Department. Moore's complaint therefore does not allege severe or pervasive harassment even when analyzed in its entirety.

Although the Complaint generally alleges that Moore "received none of the assignments on which he bid during the 2013-2016 bidding process," Compl. ¶ 44, it does not allege that he was denied any particular assignment or promotion during the 45-day filing period. See Leiterman v. Johnson , 60 F.Supp.3d 166, 187 (D.D.C. 2014) (non-promotion treated as a "discrete employment action" for exhaustion purposes, and "the mere allegation that Plaintiff continued in his position" during the 45-day filing window "without the promotion he believed was due [could not] save Plaintiff's claim"). Nor did Moore administratively exhaust any discrete non-promotions or bid rejections. See Pl.'s Opp'n Ex. 1 at 11, Dkt. 23-1 (ECF pagination) (asserting only that "promotions are withheld," without specifying which positions or when); see also Sierra v. Hayden , 254 F.Supp.3d 230, 243-44 (D.D.C. 2017) (plaintiff "had an obligation to file administrative complaints within the time required under [agency] regulations for each alleged non-promotion, because each instance of non-promotion constituted a discrete discriminatory action" (internal quotation marks omitted) ); Krishnan v. Foxx , 177 F.Supp.3d 496, 504 (D.D.C. 2016) (each "unsuccessful application[ ] for promotion" was "a discrete event that required a timely EEO complaint.").

Further, it is not clear that the Department could have prevented or interfered with Young's participation in the Office of Inspector General proceeding without running afoul of Title VII's antiretaliation provisions. See Paulk v. Architect of the Capitol , 79 F.Supp.3d 82, 90-91 (D.D.C. 2015) (assuming that the plaintiff's "participation" in an "OIG safety investigation" constituted protected activity for purposes of Title VII suit), aff'd in part , No. 15-5036, 2015 WL 5231062 (D.C. Cir. July 1, 2015), dismissed , No. 15-5036, 2015 WL 6153697 (D.C. Cir. Oct. 7, 2015) ; cf. Perry , 766 F.Supp.2d at 166 (employer entitled to summary judgment where Title VII claim was based on the employer's failure to stop its employees' protected activity).

The Court does not consider whether the same exhaustion analysis applies to count II.